

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-14-00386-CV

IN THE INTEREST OF C.S.,
A CHILD

----------

### FROM THE 97TH DISTRICT COURT OF MONTAGUE COUNTY
### TRIAL COURT NO. 2013-0521M-CV

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

This is an ultra-accelerated appeal[2] from an order terminating the parental

rights of Appellant S.S. (Mother) to her child C.S.  In four issues, Mother argues

that the evidence is legally and factually insufficient to support the trial court's

----

[1]*See* Tex. R. App. P. 47.4.

[2]*See* Tex. R. Jud. Admin. 6.2(a) (requiring appellate court to dispose of appeal from a judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal is filed).

findings under Texas Family Code section 161.001(1)(D), (E), and (O) and section 161.001(2).[3]  *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (O), (2) (West 2014).  We will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Overview

Mother is the mother of three children—C.S., L.S., and A.S.—none of whom lived with her at the time of the termination trial.  This case involves only Mother's daughter C.S., who was removed from Mother's care after Mother tested positive for methamphetamine in June 2012.[4]  Mother initially demonstrated enough progress on her court-ordered service plan to earn a monitored return of C.S.  But during the monitored return, Mother violated multiple conditions of the monitored return order, and the Department removed C.S. from Mother's care a second time.  Mother thereafter failed to complete her court-ordered services to obtain the return of C.S., who was nine years old at the time of the termination trial and was living in a residential treatment center (RTC) in Abilene due to severe ADHD and other behavioral disorders.

---

[3]C.S.'s Father's parental rights were also terminated, but he did not appeal the termination order.

[4]Although the Department of Family and Protective Services (the Department) removed Mother's sons, L.S. and A.S., at the same time as C.S., C.S.'s case was severed from L.S. and A.S.'s case, and they are not involved in this appeal.

2

## B.  The Initial Referral—C.S.'s Black Eye

In February 2012, the Department received a referral alleging physical abuse of C.S. by Mother.  C.S. appeared at school with a black eye after being absent the previous week and stated that Mother had hit her in the eye.  During her forensic interview, C.S. changed her story and said that she did not know how she had received a black eye.  Mother said that C.S. had received a black eye because she had been jumping on the furniture with her brothers.

Although the allegations were ruled "unable to determine" and C.S. was allowed to remain in Mother's home, the Department opened a Family-Based Safety Services (FBSS) case.  Mother completed counseling sessions, but she failed to complete parenting classes, to maintain employment, and to consistently take C.S. to Mental Health and Mental Retardation (MHMR) and to counseling.  Mother was unable to pay her electricity bill, which resulted in her moving in with family when the electricity was cut off.

## C.  The Removal—Mother's Positive Drug Test

The FBSS caseworker gave Mother a drug test in June 2012, and she tested positive for methamphetamine and amphetamine.  Mother testified that she had been using methamphetamine for approximately three months at the time that she tested positive.  Mother said that C.S.'s step-grandparents, who also took care of C.S., had been using methamphetamine with Mother.  The Department removed C.S. and placed her in foster care.  The Department thereafter gave Mother a service plan, which she signed on July 25, 2012.

## D. The Monitored Return

Approximately a year and a half later, Mother's caseworker Norma Rodriguez met with Mother and the Department's regional attorney, and they discussed the possibility of a monitored return because it appeared that Mother was "getting things together." Although Rodriguez discussed with Mother the financial issues that she saw in Mother's life, Mother did not seem to think that they were a problem. Mother responded that she had a plan, which included continuing to work for her boss Jay[5] and looking for a job that paid full time. Mother asked the Department for money to help with getting her utilities turned on in her new home in Muenster, and Rodriguez said that the Montague County Child Welfare Board assisted Mother with her utilities when she was setting up her house for C.S. Court-Appointed Special Advocates (CASA) also helped Mother financially by purchasing pots and pans, dishes, kitchen utensils, and bedding for Mother in preparation for the monitored return.

Because Mother had demonstrated that she was able to abstain from drug use and because she was working the services on her plan, the trial court granted a monitored return of C.S. to Mother. As part of the monitored return, the trial court ordered that, among other conditions, Mother (1) would request approval from the Department before engaging a childcare provider for C.S.; (2) would not place C.S. in the care of another person who had not been previously

---

[5]Pursuant to Texas Rule of Appellate Procedure 9.8(b)(2), we use a pseudonym. *See* Tex. R. App. P. 9.8(b)(2).

4

approved as a caretaker by the Department, with the understanding that all day care providers and/or babysitters, including family members and "significant others," must be approved by the Department in advance, which required the Department to have the names, dates of birth, and Social Security numbers of the individuals at least three days in advance of C.S. being left in their care; (3) was prohibited from any type of physical discipline of C.S. for any reason; (4) was required to participate fully in family counseling with C.S. and to follow all recommendations of the family counselor; and (5) was required to have C.S. attend school daily and on time. Mother agreed to abide by the terms and conditions of the monitored return, and the Department returned C.S. to Mother on December 20, 2013.

Throughout the monitored return from December 2013 until May 2014, Mother struggled with financial problems and told Rodriguez that she could not pay her rent or utilities because her work was "on and off"; Mother wanted the Department to pay her rent and her bills. Rodriguez submitted a request to the Montague County Child Welfare Board, but the response was that they could not assist Mother. Mother told Rodriguez that she was struggling with purchasing food for herself and C.S., and Rodriguez directed Mother to the food pantry.

## E. Violations of the Monitored Return

### 1. Mother's Failures to Get C.S. to School on Time

During the middle of the monitored return, Rodriguez discovered that C.S. had been absent or tardy frequently from school.[6] Rodriguez discussed with Mother the importance of getting C.S. to school on time, and Mother responded that it was C.S.'s fault because she would not listen and because she took her time walking to school. Rodriguez told Mother that she needed to work with C.S., that Mother needed to make a better effort to get C.S. to school on time, and that Mother should walk C.S. to school instead of allowing her to walk by herself. The records from the school nurse show that during the time of the monitored return, C.S. often came to school without having taken her ADHD medication or without having eaten breakfast and that Mother often requested that medication be sent home because she was out of medication at home.

Mother explained that C.S. arrived tardy to school often when she was first returned to Mother because Mother was on pain medicine for rheumatoid arthritis and had "a lot of problems getting up in the morning." Mother said that around May 2014, she was placed on a pain patch that enabled her to get up on time. Mother testified that it is important for a parent to make sure her child arrives at school on time so that she does not miss anything at the beginning of class.

---

[6]C.S.'s school records reveal that from January 2014 to May 2014, she had been absent twelve times—five absences were unexcused, and seven absences were excused—and had been tardy ten times.

Mother did not believe that being absent twelve days and being tardy ten days in fewer than five full months was an acceptable attendance record for a second-grade child. Mother was aware that C.S. was retained in second grade because of her multiple absences. Mother said that some of C.S.'s absences from school were excused absences due to illnesses and that some of the absences were related to the babysitter not getting C.S. to school.

Rodriguez did not ask the trial court to end the monitored return after she had investigated C.S.'s school attendance because Mother had agreed to start walking C.S. to school and because Mother had said that she would do her best to have C.S. arrive at school on time. Rodriguez knew that C.S. wanted to stay with Mother and that factored into Rodriguez's decision.

### 2. Mother Slapped C.S.

Mother admitted that during the monitored return, she had slapped C.S. because C.S. was "having a really bad morning" and because of the way C.S. was acting. Mother explained that C.S. was "[n]ot listening, mouthy, getting into stuff, touching stuff, wouldn't stop. She kept on, kept on, kept on, kept on, kept on. No matter how many times I tried to redirect her, put her in time out, every little thing I tried to do . . . wasn't working." Mother considered C.S.'s behavior to be partly due to her ADHD and to her "just being bad." Mother admitted that she knew that it was a violation of the monitored return order to use any physical discipline. Mother testified that the parenting classes taught her that it was okay

7

to spank a child as long as she was not doing it out of anger.[7] Mother testified that she considered slapping an eight-year-old to be the same as spanking.

Rodriguez reminded Mother that physical punishment was not allowed during the monitored return, and Rodriguez suggested that Mother continue with family counseling. Rodriguez did not ask the trial court to end the monitored return after Mother slapped C.S. because Rodriguez believed that family counseling would help.

### 3.  Domestic Violence in the Home

In March 2014, an investigation revealed that Mother's boss Jay was staying in Mother's home overnight and that he and Mother had a physical altercation with C.S. present. Mother told Rodriguez that Jay was staying with Mother and C.S. because Mother did not like being alone. Rodriguez said that Mother admitted to her and to the investigator that Mother went after Jay and wanted to knock him out. Mother told Rodriguez that she and Jay got angry and that they "[went] at it together" but that it was not a big deal because C.S. was not present and was not hurt. Mother testified at trial that Jay did not physically abuse her and that she never told Rodriguez that he had abused her. As a result of the incident, the trial court ordered that Jay was not to have any contact with C.S.

---

[7]Mother testified that she had completed parenting classes at the Pregnancy Resource Center in 2013.

### 4. Mother Allowed Unapproved Caretakers to Babysit C.S.

Rodriguez learned from the school[8] that Mother had left C.S. with a couple named Edna and Henry, who had not been preapproved by the Department as babysitters for C.S. When Rodriguez asked Mother about it, she said that Edna and Henry had watched C.S. for only a couple of days, including overnight after Mother was injured at work and could not watch C.S., and that she did not attempt to get them approved by the Department because she knew they would not be approved. Mother testified that she knew that Edna and Henry each had a previous drug conviction, but Mother said that she did not know that Edna and Henry each had a conviction for endangerment to a child. Mother testified that there was nothing wrong with allowing someone who was on probation for possession of methamphetamine and for injury to a child to watch her child.

In addition to the above acts, Rodriguez testified that she decided to end the monitored return after comments Mother made during a visit. Mother said that she was to the point where she was done fighting for her kids and was tempted to "go do dope." Mother also told Rodriguez that she was almost to the point of having the Department pick up C.S. and that she would forget about her sons because her children were not listening to her, her children had destroyed her house at the last visit, and she was struggling to keep a babysitter for C.S.

---

[8]The school nurse's April 16, 2014 notes state that C.S. came to see the nurse because "Mom took a break from me last night & I stayed [with] the babysitter" and because C.S. forgot to take her medication.

due to C.S.'s destruction of the prior babysitter's house. Mother made these comments to Rodriguez while C.S. was in the room. When Rodriguez told Mother that it was not appropriate to have this conversation in front of C.S., Mother said that C.S. needed to hear it.

## F. Mother's Compliance with the Service Plan

After the Department removed C.S. from Mother a second time in May 2014,[9] a family team meeting was held, and they devised a July 2014 service plan. Mother's July 2014 court-ordered service plan required her to complete the following tasks: (1) submit to random drug screens on the day requested by swab, hair follicle, or urine, and test negative for all illegal drugs or any prescription drugs for which she did not have a current medical doctor note; (2) actively participate in family counseling and follow all recommendations of the counseling; (3) authorize the release of medical and mental health records to the caseworker; (4) demonstrate she had a legal source of income and could provide for C.S. on an ongoing basis by providing the caseworker with pay stubs verifying employment or by providing the caseworker with job applications showing continuing efforts to locate employment; (5) visit with C.S. every Wednesday; (6) inform the Department of any change of address or phone number within three days of the change; (7) complete a budget, showing Mother's current expenses and the cost of the household with C.S. living in the home, and provide the

---

[9]Rodriguez said that C.S. initially went to a shelter for a couple of days after she was removed from Mother's home.

budget to the current caseworker to be filed with the court by August 11, 2014; (8) provide and maintain a safe and stable home with working utilities; allow announced and unannounced home visits by CPS, CASA, and the attorney for C.S.; and provide the names, dates of birth, and Social Security numbers for anyone residing in the home; (9) contact Paula Harley by August 11, 2014, about establishing Medicaid benefits; (10) stay away from all individuals engaging in criminal activity and refrain from all criminal activity; and (11) comply with all court orders and CPS service plans on an ongoing basis.[10]  Mother agreed at trial that she had gone over the service plan with her caseworker and that she understood she was ordered by the court to complete the services on her plan.

### 1. Drug Screenings

Mother testified that she had always submitted to random drug screens but that she had tested positive on the screens in January and February 2013. Mother testified that she had last used methamphetamine at the beginning of February 2013, which was ten months prior to the monitored return.  With regard to her sobriety plan, Mother testified that she never had a drug problem; she used drugs for three months,[11] and after that, she did not want to use drugs.

---

[10]Many of the tasks on the July 2014 service plan mirrored those from the July 2012 service plan.

[11]The record reflects that Mother used drugs for longer than three months: Mother started using methamphetamine after she lost her job on March 6, 2012; she tested positive for methamphetamine and amphetamine on June 21, 2012; she admitted to using methamphetamine on September 25, 2012; she tested positive for methamphetamine and amphetamine on November 7, 2012; and she

## 2. Family Counseling

Mother testified that she and C.S. had attended four or five family counseling sessions together with Cheryl Harrington. Mother said that the counseling sessions took place at the Dairy Queen in Nocona and that it was always very distracting and stressful because C.S. wanted to play. Mother testified that she informed CPS that she wanted a different counselor because she did not like Harrington and did not feel comfortable talking to her.

When Mother informed Rodriguez that she did not feel comfortable with Harrington, Rodriguez told Mother that Harrington was the only counselor who did home-based counseling and that if Mother wanted to change counselors, the Department would set up the services in Wichita Falls. Mother said that she could not travel to Wichita Falls. Rodriguez also offered Mother a room at the Bowie CPS office where she could do her counseling, but Mother said that she could not travel to Bowie. Rodriguez testified that there is no CPS office in Muenster and that there is no facility closer to Muenster than Bowie or Wichita Falls. Rodriguez testified that Mother did not actively participate in family counseling and follow all of the recommendations and that she had decided to quit counseling with Harrington; Rodriguez said that Mother was not released by Harrington.

---

last tested positive for methamphetamine and amphetamine on February 20, 2013.

### 3. Medical Releases

Mother signed a release for all medical and mental health records.[12]

### 4. Employment

Mother testified that she had earned her GED, had previously been in the Army, and had previously worked for the State, a furniture company, Walmart, and a well service. Mother testified that with regard to providing the Department with paystubs verifying her employment, she had taken pictures of every single check she had received and had turned in those pictures to Rodriguez. When asked whether she had a legal source of income during the pendency of the case, Mother testified that she did and said, "It's been a little bit more stable than it is now."

Mother explained that she was working with Jay[13] part-time for less than thirty hours per week at the rate of $20 per hour and that she was working with him only when she had to in order to have money to go visit her children. Mother said that she had made $500 the week before the termination trial and that she

---

[12]Mother testified that she had been injured on the job and had been diagnosed with rheumatoid arthritis and fibromyalgia. Mother testified that she was taking Fentanyl and hydrocodone for pain, Xanax for anxiety, and Deloxin for ADHD. Mother said that she had always had ADHD and that she had learned to control it over the years but that it had always caused her to have trouble remembering specific dates and times.

[13]Mother testified that she had previously been in a romantic relationship with Jay but that she had ended the relationship a month before the termination trial because she did not receive a regular, steady paycheck from him and because they had too many differences.

had used the money to pay a ticket for speeding and no insurance. Mother said that she was not averaging $500 per week because she did not receive a steady paycheck.

Mother testified that she was looking for a job with a regular, steady paycheck; that she had been looking for a job for about two weeks prior to the termination trial; and that she had applied at numerous businesses. With regard to her compliance with the service plan's requirement that Mother provide the Department with proof of her continuing efforts to locate employment, Mother admitted that she had not provided the Department with copies of any job applications that she had completed.

### 5. Visits

Mother said that she had visited C.S. for two hours every other week at the Abilene RTC. Mother testified that prior to the phone number at the Abilene RTC changing, she had talked to C.S. every day. Mother testified that her visits with C.S. were very good and that she always tried to bring activities that they could do together as a family, like playing games on her phone together or carving pumpkins.

Mother said that she had missed the first visit because she did not have gas money. Rodriguez testified that the Department facilitated some of the visits between Mother and C.S. by taking Mother to Abilene to visit C.S. Mother agreed that the Department had provided her with a $25 gas card to help with gas to the visitation the day before the trial.

14

## 6. Change of Address

Mother admitted that she had not informed the Department prior to the termination trial that she was living at addresses in both Muenster and Sunset; Mother said that she was just staying with her aunt but had not moved in.[14]

## 7. Budget

Mother admitted that she had not provided CPS with a budget. Mother admitted that when C.S. started living with her in January through March 2014, Mother had struggled to support C.S. Mother testified that her water was shut off right after the Department initially removed C.S. and that CPS had helped her get the water turned back on for the monitored return. Mother said that she had asked CPS and CASA at different times from January 2014 until May 2014 for financial assistance with her rent or utilities and that she had asked for food at the beginning of the case. When it was pointed out to Mother that, according to her own testimony, she had received a $10,000 income tax refund during that time,[15] Mother said that she might have not received that much and that she does not remember everything. Mother told Rodriguez that she spends "a big chunk out of her paychecks" on her medications and then pays the utilities.

---

[14]Rodriguez testified that Mother had never mentioned living with her aunt prior to the termination trial.

[15]Mother testified that she had received a $10,000 income tax refund check in February 2014 and that she had used $3,500 of that amount to make a down payment on a car and had used the rest for bills, doctor bills, and "stuff for the kids."

Mother testified that at the time of the termination trial, her monthly bills included a car payment and insurance, as well as rent, electricity, and water on the house that she was still renting.[16]

### 8. Safe and Stable Housing

Mother testified that at the time of the termination trial, she was staying two places: with Jay in Muenster and with her aunt in Sunset. Mother agreed that she had lived at or had stayed in at least four different locations since June 2012 when C.S. was initially removed and thus had not provided a safe and stable home for C.S. Mother had, however, always allowed CPS, CASA, and the attorney ad litem into her home and had provided CPS with the names, dates of birth, and Social Security numbers of people residing in her home.

### 9. Medicaid

Mother said that she did not contact Paula Harley about establishing Medicaid benefits because she "just barely found out her name." Mother testified that she had requested a copy of the service plan but had not received it until a week before the termination trial. Rodriguez testified that after the family meeting in July 2014, Mother discussed setting up Medicaid benefits for herself and said

---

[16]Mother said that the Department had requested that she maintain the house in Muenster and that she keep the utilities on. Mother testified that she had not lived there since C.S. was removed after the monitored return because Mother does not like staying in her house by herself. Rodriguez testified that she never told Mother that she needed to maintain the utilities and to pay the rent on the home in Muenster after C.S. was removed from Mother during the monitored return.

16

that she had Paula Harley's name. Mother admitted that she did not call anyone and ask for the name and phone number of the person she was supposed to contact.

### 10. New Criminal Charge

Mother admitted that she had not refrained from criminal activity because she had been charged with possession of methamphetamine in August 2014. Mother explained that she was "set up"; somebody left some "dope" in her car, and she did not know about it. When Mother was pulled over, she threw the dope out of the car because the dope was not hers, and she was charged for possession. Mother hoped to receive two years' probation for the possession charge, but she had not gone to court on it at the time of the termination trial.

### G. C.S.'s Condition at the Time of the Termination Trial

Rodriguez testified that C.S. is a lovable little girl who ended up in an RTC because of her behaviors and the level of care she needed.[17] Rodriguez testified

---

[17]As a result of C.S.'s psychological evaluation, she was diagnosed with Mood Disorder; ADHD; Combined Type Conduct Disorder, Child Onset (includes Oppositional Defiant Disorder); and Learning Disorder. The record reflects that even while on medication, C.S. had attempted to start a fire at her placement by throwing paper towels on a lit stove, had stuck hot marshmallows on her brother's forehead, and had put hand sanitizer on marshmallows and attempted to feed them to her brother. Additionally, C.S. had been sent home from school several times for behavioral problems, including stealing things from her teachers and peers, using unkind and cuss words toward her peers, not completing her work, being destructive of her work, hitting and shoving her peers, and being defiant and disrespectful toward her teacher. C.S. had been "expelled from the bus" for calling African-American children derogatory names and for slapping her brother's head when he was asleep on the bus. Rodriguez said that during the time that she was assigned to C.S.'s case, C.S. had lived in the RTC in Victoria,

that C.S.'s behavior issues had improved while she had been living at the RTC, which monitored her medications and which provided C.S. with a structured environment, a routine schedule, therapy, and schooling. Rodriguez testified that the RTC offered C.S. rewards for good behavior, including outings to go bowling. Rodriguez said that C.S. had responded well to the structure and routine offered in the RTC's environment. Rodriguez agreed that C.S. needed a structured, routine, and stable environment in order to thrive.

Mother testified that C.S. is doing a little bit better with her ADHD. But Mother testified that she thought C.S. seemed a little bit more stressed because she was thinking about wanting to come home and did not want to be at the Abilene RTC.

Brook McLemore, the CASA program director, testified that CASA was appointed as the guardian ad litem for C.S. McLemore testified that she had visited with C.S. on two occasions and that she is a very sweet girl who is very polite, very energetic, and very talkative. McLemore said that C.S. was doing very well and had vastly improved in school.

## H. Recommendations

Mother asked the trial court to allow C.S. to come home with her. Mother said that her first priority was keeping herself healthy and out of jail and that her

---

in Mother's home for the monitored return, in a shelter, and at the RTC in Abilene. Prior to the time that Rodriguez had the case, C.S. was moved approximately four times.

18

plans included going back to Sunset to live with her aunt and enrolling C.S. in school in Bowie. Mother had not spoken to her aunt about having C.S. live with her but did not think her aunt would have a problem with C.S. living in her house. Mother said that she would get a job and that her family and Jay would help her support C.S. Mother testified that she could provide for C.S.'s physical needs, making sure that she was fed and clothed and had a home. Mother testified that if the trial court returned C.S. to Mother, she would deal with C.S.'s ADHD better than she did last time. Mother explained that she was not perfect and had made plenty of mistakes during the monitored return but that she had learned a lot and would handle situations differently.[18] Mother described herself as "an awesome parent" but said that she had lots of struggles because she had to do everything by herself. Mother testified that it would be in C.S.'s best interest to be returned to Mother rather than to remain in her current situation where she was more stressed out and dealing with "all kinds of stuff that she shouldn't have to deal with by herself."

Mother was aware that the Department's plan was for C.S. to be adopted by the foster parent who was caring for Mother's sons. Mother admitted that the foster parent has a job and stability and that Mother did not have those. But Mother testified that it was not in C.S.'s best interest to be adopted by the foster

---

[18]Mother said that the things she would have done differently included not slapping C.S., pushing herself harder to get up in the mornings, making sure C.S. arrived at school on time, taking C.S. to school instead of letting her walk, and not letting C.S. go to the unapproved babysitters' house.

parent because C.S. wanted to come home with Mother and that "just because [the foster father has] a good job and good money and a wife that can help him out, that doesn't mean . . . that that's a good situation for [C.S.]"

Rodriguez testified that a relative of Mother's son's father had requested a home study so that he might adopt C.S. and that the foster parents of Mother's sons were also interested in adopting C.S. Rodriguez opined that it is in C.S.'s best interest for Mother's parental rights to be terminated.

CASA recommended the termination of Mother's parental rights to C.S. and opined that termination would be in C.S.'s best interest.

## I. Outcome

After hearing the above testimony and reviewing the exhibits admitted into evidence, the trial court found by clear and convincing evidence that Mother had knowingly placed or had knowingly allowed C.S. to remain in conditions or surroundings that had endangered the physical or emotional well-being of C.S., that Mother had engaged in conduct or had knowingly placed C.S. with persons who had engaged in conduct that had endangered the physical or emotional well-being of C.S., that Mother had failed to comply with the provisions of a court order that specifically established the actions necessary for Mother to obtain the return of C.S. who had been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of C.S.'s removal from Mother under chapter 262 for abuse or neglect of C.S., and

20

that termination of the parent-child relationship between Mother and C.S. was in C.S.'s best interest. This appeal followed.

### III. BURDENS OF PROOF AND STANDARDS OF REVIEW

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2014); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 554–55; *Holick*, 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, .206(a) (West 2014); *E.N.C.*, 384 S.W.3d at 802. "[C]onjecture is not enough." *E.N.C.*, 384 S.W.3d at 810. Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also E.N.C.*, 384 S.W.3d at 802. Evidence is clear and convincing if it "will produce in the

21

mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent-child relationship, the Department must establish by clear and convincing evidence that the parent's actions satisfy one ground listed in family code section 161.001(1) and that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.—Fort Worth 2012, no pet.).

## A. Legal Sufficiency

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence

22

favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* "A lack of evidence does not constitute clear and convincing evidence." *E.N.C.*, 384 S.W.3d at 808.

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses because that is the factfinder's province. *J.P.B.*, 180 S.W.3d at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

### B. Factual Sufficiency

We are required to perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support the termination of a parent-child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated (D), (E), or (O) of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001(1), (D), (E), (O), (2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a

23

factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## IV. Sufficient Evidence to Support Section 161.001(1) Finding

In her first and second issues, Mother argues that the evidence is legally and factually insufficient to support the trial court's findings under Texas Family Code section 161.001(1), (D), (E), and (O). We will review the record to determine whether sufficient evidence supports the trial court's finding under subsection (O).

## A. Section 161.001(1)(O)

Texas Family Code section 161.001(1)(O) provides that the trial court may order termination of the parent-child relationship if the trial court finds by clear and convincing evidence that the parent has

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child[.]

Tex. Fam. Code Ann. § 161.001(1)(O).

## 1. Compliance with Court-Ordered Service Plan

Mother argues that the evidence is insufficient to establish that she failed to comply with her service plan.

24

It is well settled that the family code does not provide for excuses for failure to complete court-ordered services, nor does it consider "substantial compliance" to be the same as completion. *See In re A.T.K.*, No. 02-11-00520-CV, 2012 WL 4450361, at *6 (Tex. App.—Fort Worth Sept. 27, 2012, no pet.) (mem. op.) (citing *In re M.C.G.*, 329 S.W.3d 674, 675–76 (Tex. App.—Houston [14th Dist.] 2010, pet. denied); *In re T.T.*, 228 S.W.3d 312, 319 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (noting Texas courts have uniformly found substantial compliance with provisions of court orders inadequate to avoid termination findings under subsection (O)); *In re T.N.F.*, 205 S.W.3d 625, 630–31 (Tex. App.—Waco 2006, pet. denied) (emphasizing that parents must comply with every requirement of the court order and that subsection (O) does not allow for consideration of excuses for noncompliance), *overruled on other grounds by In re A.M.*, 385 S.W.3d 74 (Tex. App.—Waco 2012, pet. denied); *Wilson v. State*, 116 S.W.3d 923, 929 (Tex. App.—Dallas 2003, no pet.) ("Wilson's economic argument does not create a factual dispute as to her compliance: it is, instead, in the nature of an excuse for her failure to comply."). Rather, any excuse for failing to complete a family service plan goes only to the best-interest determination. *See T.N.F.*, 205 S.W.3d at 631; *see also Holley v. Adams*, 544 S.W.2d 367, 371 (Tex. 1976); *In re C.M.C.*, 273 S.W.3d 862, 874–75 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (holding that mother's argument that she did not take a parenting class because none were available "[did] not create a factual dispute

25

as to her compliance; rather, it is in the nature of an excuse for her failure to comply").

Mother's service plan from July 2014 is set forth above and contains tasks similar to those on her July 2012 service plan. The record includes undisputed evidence that Mother tested positive on random drug tests in January and February 2013; that she quit family counseling and was not successfully discharged by the family counselor; that Mother failed to provide her caseworker with job applications showing Mother's efforts to locate employment; that she failed to inform the Department of changes in her address within three days of the changes; that she failed to complete a budget and submit it to her caseworker for filing with the trial court by August 11, 2014; that she failed to provide and maintain a safe and stable home with working utilities; that she failed to contact Paula Harley by August 11, 2014, about establishing Medicaid benefits; and that Mother failed to refrain from all criminal activity because she was charged with possession of methamphetamine in August 2014. It is also undisputed that Mother failed to comply with several of the conditions of the monitored return order by slapping C.S., by failing to seek prior approval for C.S.'s caretakers, and by failing to have C.S. attend school every day and to have C.S. arrive on time.

Mother argues that she complied with many provisions of the court-ordered service plans, that she substantially complied with the provision requiring her to attend family counseling, and that there were justifiable excuses for her

26

noncompliance on the remaining provisions. As set forth above, the family code does not allow excuses for the failure to complete court-ordered services and requires completion, not "substantial compliance." *See M.C.G.*, 329 S.W.3d at 675–76; *T.T.*, 228 S.W.3d at 319; *T.N.F.*, 205 S.W.3d at 630–31. Mother therefore failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of C.S. *See* Tex. Fam. Code Ann. § 161.001(1)(O).

## 2. Nine-Month Requirement

Mother does not challenge the nine-month requirement. For the sake of completeness, we note that the Department was named temporary managing conservator of C.S. on June 22, 2012, and remained C.S.'s temporary managing conservator until the trial in November 2014, at which time the Department was appointed C.S.'s permanent managing conservator. C.S. had therefore been in the permanent or temporary managing conservatorship of the Department for not less than nine months at the time the trial court ordered the termination of Mother's parental rights to C.S. *See id.*

## 3. "Abuse or Neglect" Requirement

Mother argues that the evidence is insufficient to establish that she abused or neglected C.S.

The Texas Supreme Court has recently reviewed the "abuse or neglect" requirement of subsection (O) and stated the following:

27

Although chapter 261's "abuse" and "neglect" definitions do not govern in chapter 262, they surely inform the terms' meanings. *See, e.g.*, *Brown v. Darden*, 121 Tex. 495, 50 S.W.2d 261, 263 (1932) ("Whenever a legislature has used a word in a statute in one sense and with one meaning, and subsequently uses the same word in legislating on the same subject-matter, it will be understood as using it in the same sense, unless there be something in the context or the nature of things to indicate that it intended a different meaning thereby."). So while subsection O requires removal under chapter 262 for abuse or neglect, those words are used broadly. Consistent with chapter 262's removal standards, "abuse or neglect of the child" necessarily includes the risks or threats of the environment in which the child is placed. Part of that calculus includes the harm suffered or the danger faced by other children under the parent's care. If a parent has neglected, sexually abused, or otherwise endangered her child's physical health or safety, such that initial and continued removal are appropriate, the child has been "remov[ed] from the parent under Chapter 262 for the abuse or neglect of the child." *See* Tex. Fam. Code [Ann.] §§ 161.001(1)(O), 262.101, .102, .104, .107, .201.

*In re E.C.R.*, 402 S.W.3d 239, 248 (Tex. 2013).

Here, the affidavit in support of removal that is attached to the petition states that "[t]here is immediate danger to the physical health and safety of the children" and explains that Mother and C.S.'s step-grandmother tested positive for methamphetamine and amphetamines on June 21, 2012, while caring for C.S. and that domestic violence was occurring in the home. The affidavit concludes, "There is a continuing danger to the physical health and safety to the child[ren] if they are allowed to stay in their current residence due to [Mother's] continued use of methamphetamines and because [C.S.], [L.S.], and [A.S.] continue to be in their parent[s'] primary care while they are under the influence of methamphetamines." This affidavit, even if not evidence for all purposes,

28

shows what the trial court relied on in determining whether removal was justified. *See E.C.R.*, 402 S.W.3d at 248. The trial court found that the children were removed pursuant to section 262.104, which allows for emergency removal without a court order, and that there was a continuing danger to the physical health or safety of the children if the children were returned to Mother. *See* Tex. Fam. Code Ann. § 262.104 (West 2014). This evidence and these findings establish that C.S. was removed from Mother under chapter 262 for abuse or neglect. *See E.C.R.*, 402 S.W.3d at 248–49.

## B. Legally and Factually Sufficient Evidence Supports Section 161.001(1)(O) Finding

Viewing all the evidence in the light most favorable to the trial court's judgment and recognizing that the factfinder is the sole arbiter of the witnesses' credibility and demeanor, we hold that there is clear and convincing evidence of Mother's failure to comply with the provisions of a court order that specifically established the actions for Mother to obtain the return of C.S. who had been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of C.S.'s removal from Mother under chapter 262 for the abuse or neglect of C.S. *See* Tex. Fam. Code Ann. § 161.001(1)(O); *E.C.R.*, 402 S.W.3d at 249 (holding that the parental conduct described in subsection (O) was established as a matter of law).

Giving due deference to the factfinder's section 161.001(1)(O) finding, without supplanting the factfinder's judgment with our own, and after reviewing

29

the entire record, we hold that a factfinder could reasonably form a firm conviction or belief that Mother had failed to comply with the provisions of a court order that specifically established the actions necessary for Mother to obtain the return of C.S. who had been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of C.S.'s removal from Mother under chapter 262 for the abuse or neglect of C.S. *See A.T.K.*, 2012 WL 4450361, at *7 (holding evidence factually sufficient to support subsection (O) finding because mother had not maintained stable employment or stable housing for six months and had not completed psychological evaluation); *T.T.*, 228 S.W.3d at 320.

### C. Disposition of Section 161.001(1) Challenges

Because, along with a best-interest finding, a finding of only one ground alleged under section 161.001(1) is necessary to support a judgment of termination, we need not address Mother's arguments challenging the trial court's findings under subsections (D) and (E) of section 161.001(1). *See* Tex. R. App. P. 47.1; *see also In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.); *In re S.B.*, 207 S.W.3d 877, 886 (Tex. App.—Fort Worth 2006, no pet.). We overrule Mother's first and second issues.

## V. SUFFICIENT EVIDENCE TO SUPPORT SECTION 161.001(2) BEST-INTEREST FINDING

In her third and fourth issues, Mother argues that the evidence is legally and factually insufficient to support the trial court's best-interest finding.

30

## A. Presumption and *Holley* Factors

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

We review the entire record to determine the child's best interest. *E.C.R.*, 402 S.W.3d at 250. The same evidence may be probative of both the subsection (1) ground and best interest. *Id.* at 249; *C.H.*, 89 S.W.3d at 28. Nonexclusive factors that the trier of fact in a termination case may also use in determining the best interest of the child include:

(A)  the desires of the child;

(B)  the emotional and physical needs of the child now and in the future;

(C)  the emotional and physical danger to the child now and in the future;

(D)  the parental abilities of the individuals seeking custody;

(E)  the programs available to assist these individuals to promote the best interest of the child;

(F)  the plans for the child by these individuals or by the agency seeking custody;

(G)  the stability of the home or proposed placement;

(H)  the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)  any excuse for the acts or omissions of the parent.

*Holley*, 544 S.W.2d at 371–72 (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807.

31

These factors are not exhaustive; some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.* That is, "[a] lack of evidence does not constitute clear and convincing evidence." *E.N.C.*, 384 S.W.3d at 808.

## B. Analysis of *Holley* Factors

With regard to the desires of the child, the record demonstrates that C.S. wanted to live with Mother. Mother said that C.S. told her at the visit the day before the termination trial that she wanted to come home, that she could not wait to come home, and that all she wanted was to come home. Mother said that C.S. had been consistent about her desire to return home throughout the case and that C.S. is bonded to Mother. Rodriguez also testified that C.S. had regularly mentioned that she wanted to live with Mother, and McLemore testified that C.S. loves Mother. The trial court was entitled to find that this factor weighed against termination of Mother's parental rights to C.S. *See W.D. v. Tex. Dep't of Family & Protective Servs.*, No. 03-14-00581-CV, 2015 WL 513267, at *6 (Tex. App.—Austin Feb. 5, 2015, no pet.) (mem. op.) (stating that children's desires to live with parent arguably weigh in favor of allowing parent to retain her parental rights, but ultimately holding that other factors were sufficient to support jury's best-interest finding).

32

With regard to the emotional and physical needs of C.S. now and in the future, C.S.'s basic needs included food, shelter, and clothing; routine medical and dental care; a safe, stimulating, and nurturing home environment; and friendships and activities appropriate to her age. Rodriguez testified that due to C.S.'s behavioral disorders, she also needed a structured, routine, and stable environment in order to thrive. Although Mother testified that she could provide for C.S.'s physical needs, the record demonstrated that Mother had struggled to provide food and to keep the utilities on when C.S. lived with her during the monitored return and that Mother's employment situation had not improved at the time of the termination trial. The record also reflected that Mother had lived at multiple addresses while the case was pending and that she was staying at two different addresses at the time of the termination trial, thus failing to demonstrate that she could provide a stable environment for C.S. The trial court was entitled to find that this factor weighed in favor of termination of Mother's parental rights to C.S.

With regard to the emotional and physical danger to the child now and in the future, McLemore testified that she was concerned that Mother had continued to believe that drug use did not make a person a bad parent, even after C.S. was removed due to Mother's positive drug test. McLemore was also concerned that Mother equated slapping an eight-year-old child with spanking. McLemore said that CASA liked "to see parents make progress over this. You know, this case has been going on two-and-a-half years and learn from their mistakes that led to

33

removal and learn to remedy those and see those as a problem, so it's a concern." Rodriguez testified that it concerned her that Mother believed that drug use does not necessarily mean that the parent does not feed, clothe, or provide shelter for the child; Mother had agreed that it "would be a different story" if the parent went to jail. Rodriguez said that when a person is under the influence of drugs, she is not able to supervise her child. Rodriguez testified that she was also concerned that Mother was hanging out with Stephen,[19] whom Mother knew had a criminal history yet did not consider it her business to ask him about it. Rodriguez said that it did not seem that Mother had learned anything from her experience when her monitored return was ended because Mother had been allowing Edna and Henry, who had criminal convictions, to babysit C.S. Moreover, Mother had not shown that she could properly handle C.S.'s ADHD without resorting to physical discipline. The trial court was entitled to find that this factor weighed in favor of termination of Mother's parental rights to C.S.

With regard to Mother's parental abilities, although Mother described herself as "an awesome parent," the record demonstrates that Mother had used methamphetamine while C.S. was in Mother's care, that Mother had allowed other methamphetamine users to care for C.S., that Mother had endured domestic violence while C.S. had lived with her, and that Mother had allowed

---

[19]Mother testified that Stephen, a friend who is a mechanic, had previously gone with her to the visitations in Abilene on two occasions, but he stayed in the car during the visits.

people whom she knew had prior drug convictions to care for C.S. Although Mother had completed a parenting course, she failed to implement the skills that she had learned from the classes she had attended, and she slapped C.S. during the monitored return despite a court order to avoid all physical discipline of C.S. Additionally, Mother failed to make sure that C.S. arrived at school on time, which caused C.S. to repeat second grade, and Mother said things in front of C.S. that Mother should not have, including that she was done fighting for her kids. The trial court was entitled to find that this factor weighed in favor of termination of Mother's parental rights to C.S.

The record revealed that the Department, the Montague County Child Welfare Board, and CASA had assisted Mother with necessities throughout the pendency of the case and that Mother had failed to take advantage of the FBSS services and the court-ordered CPS services that she was offered. The trial court was entitled to find that this factor weighed in favor of termination of Mother's parental rights to C.S.

With regard to the plans for the child by the individual seeking custody and the stability of the home or proposed placement, Mother's plans for C.S. included enrolling her in school in Bowie and living with Mother's aunt in Sunset; however, Mother had not asked her aunt if C.S. could live with her. Mother had also not mentioned this plan to the Department, and thus the Department had not approved the aunt's house as a suitable home. The foster parent who wanted to

35

adopt C.S. had a stable home. The trial court was entitled to find that these factors weighed in favor of termination of Mother's parental rights to C.S.

With regard to the acts or omissions of Mother that may indicate the existing parent-child relationship is not a proper one, the analysis set forth above—which details that Mother tested positive for methamphetamine while C.S. was in her care, that Mother left C.S. in the care of drug users, that Mother slapped C.S. when she was under a court order to avoid all physical discipline, that Mother had allowed individuals who had drug convictions and convictions for endangering a child to babysit C.S., and that Mother failed to take advantage of the services she was offered—reveals that the existing parent-child relationship between Mother and C.S. is not a proper parent-child relationship. The trial court was entitled to find that this factor weighed in favor of termination of Mother's parental rights to C.S.

As for any excuse for the acts or omissions of the parent, Mother first testified that she was not making excuses for anything that she had done; she took responsibility for her actions, including for not trying harder, for not being a perfect parent, for using drugs while C.S. was in her care, for using drugs through February 2013, and for not getting C.S. to school on time. Mother then proceeded to set forth some excuses. She recalled testifying in June 2014 that it was C.S.'s fault that she was not getting to school on time and testified that some of the days when C.S. was tardy were C.S.'s fault because no matter how fast Mother pushed C.S. out of the door, "she would just do whatever she wanted,

36

didn't care." Mother testified that some of the financial problems were her fault and some of them were not; she explained that it was not her fault that she did not get paid. Mother agreed that she had given that same explanation in June 2014 and that she had continued to work with Jay until a few weeks before the termination trial in November 2014. Mother testified that the majority of the fault for C.S.'s coming into the Department's care in May 2014 was hers because she did not seek the Department's prior approval of the people who had watched C.S. but that it was not her fault that she was injured in an accident at work and therefore needed someone to watch C.S. Mother also testified that she did not complete her family counseling because she was not comfortable talking to the counselor. Because Mother accepted some responsibility but also gave excuses, the trial court was entitled to find that this factor was neutral.

Viewing all the evidence in the light most favorable to the best-interest finding and considering the nonexclusive *Holley* factors, we hold that the trial court could have reasonably formed a firm conviction or belief that termination of the parent-child relationship between Mother and C.S. was in C.S.'s best interest, and we therefore hold the evidence legally sufficient to support the trial court's best-interest finding. *See* Tex. Fam. Code Ann. § 161.001(2); *Jordan v. Dossey*, 325 S.W.3d 700, 733 (Tex. App.—Houston 2010, pet. denied) (holding evidence legally sufficient to support the trial court's finding that termination of mother's parental rights was in child's best interest when most of the best-interest factors weighed in favor of termination); *see also In re T.R.M.*, No. 14-14-00773-CV,

2015 WL 1062171, at *11–12 (Tex. App.—Houston [14th Dist.] Mar. 10, 2015, no pet.) (mem. op.) (holding evidence legally sufficient to support trial court's best-interest finding based on mother's lack of a safe, stable home environment; lack of stable employment; noncompliance with services; and drug use).

Similarly, reviewing all the evidence with appropriate deference to the factfinder, we hold that the trial court could have reasonably formed a firm conviction or belief that termination of the parent-child relationship between Mother and C.S. was in C.S.'s best interest, and we therefore hold that the evidence is factually sufficient to support the trial court's best-interest finding. *See* Tex. Fam. Code Ann. § 161.001(2); *Jordan*, 325 S.W.3d at 733 (holding evidence factually sufficient to support the trial court's finding that termination of mother's parental rights was in child's best interest when most of the best-interest factors weighed in favor of termination); *S.B.*, 207 S.W.3d at 887–88 ("A parent's drug use, inability to provide a stable home, and failure to comply with [a] family service plan support a finding that termination is in the best interest of the child.").

We overrule Mother's third and fourth issues.

## VI. CONCLUSION

Having overruled Mother's four issues, we affirm the trial court's judgment terminating Mother's parental rights to C.S.

/s/ Sue Walker
SUE WALKER
JUSTICE

PANEL:  GARDNER, WALKER, and MEIER, JJ.

DELIVERED:  April 23, 2015